IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DANIEL HRNA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO.  5:19-cv-00209 |
| | § | |
| PHARMERICA CORPORATION, AND | § | |
| PETERSON REGIONAL MEDICAL | § | |
| CENTER FOUNDATION, | § | |
| | § | |
| Defendants | § | |

## PLAINTIFF'S SWORN ORIGINAL COMPLAINT

Plaintiff Daniel Hrna ("Hrna" or "Plaintiff"), files his Sworn Original Complaint against PharMerica Corporation and Peterson Regional Medical Center Foundation ("Defendants").

## SUMMARY

1.      Defendants willfully and maliciously forcibly retired Hrna because of his age (78 years old), disability, and in retaliation for engaging in protected activities, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, Texas Commission on Human Rights Act ("TCHRA"), TEX. LAB. CODE ANN. § 21.001 *et seq.*, and Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.  See, e.g., Weaver v. Amoco Production Co.,* 66 F.3d 85, 87 (5th Cir. 1995) (affirming age discrimination verdict and award of liquidated damages for plaintiff where the employer's manager told him that "you'll have to retire.").

## THE PARTIES, JURISDICTION, AND VENUE

2.      The Plaintiff, Hrna, is a natural person residing in Kerrville, Texas.  He was employed by Defendants located at 551 Hill Country Drive, Kerrville, Texas 78028.  Hrna has standing to file this lawsuit.

3.      PharMerica Corporation ("PharMerica"), is a foreign corporation that may be served with process through its registered agent, Corporation Service Company dba CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218. During both 2017 and 2018, PharMerica engaged in an industry affecting commerce and employed twenty or more employees for each working day in each of twenty or more calendar weeks.

4.      Peterson Regional Medical Center Foundation ("PRMC"), is a citizen of Texas, and may be served with process through its registered agent, Patrick Murray, 551 Hill Country Drive, Kerrville, Texas 78028.  During both 2017 and 2018, PRMC engaged in an industry affecting commerce and employed twenty or more employees for each working day in each of twenty or more calendar weeks.

5.      PharMerica and PRMC operate as a single integrated business enterprise, and share: (a) interrelation of operations, (b) centralized control of labor relations, (c) common management, and (d) common ownership or financial control.  Each is equally liable for the other's violations of the ADEA, TCHRA, and FMLA, as set forth herein.

6.      The Court has personal jurisdiction over PharMerica and PRMC based on both general and specific jurisdiction.

7.      Personal jurisdiction is proper because Defendants each have continuous and systematic contacts with and in the State of Texas, and the events or omissions giving rise to the Plaintiff's claims occurred in the State of Texas.

8.      Subject matter jurisdiction is proper because Hrna brings claims under federal law (the ADEA and FMLA).  The Court has supplemental jurisdiction over Hrna's state law claims under the TCHRA.

9.      Venue is proper in this Court because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in the Western District of Texas, and the unlawful employment practices alleged in this case occurred in the Western District of Texas.

## FACTUAL BACKGROUND

### A.    Hrna's Background

10.     Hrna was born on March 19, 1940, and is currently 78-years old.

11.     Hrna received his Bachelor's Degree in Pharmacy in 1963 and his law degree in 1970, both from The University of Houston.  From 1966 until 1994, Hrna rose to the position of Director of Pharmacy for three separate hospital pharmacies.  Then, after the passing of his wife, Hrna focused on his law practice from 1994 to 2006.

12.     In 2006, Hrna felt it was time to return to his passion for pharmacy.  That year, he scaled down his law practice and joined PRMC and PharMerica's predecessor as a staff pharmacist.  Over the twelve years that Hrna worked for PRMC and PharMerica's predecessor, and then PharMerica, Hrna received rankings of 3 and 4 on a scale of 1-4 (1 is "poor" and 4 "exceeds expectations").  In fact, Hrna received an overall ranking of 4 – exceeds expectations – during his most recent review in the summer of 2017.  Notwithstanding his esteemed 50+ year career, including twelve years of exemplary service with PRMC and PharMerica, Hrna's employment ended abruptly after he was wrongfully and illegally terminated by PRMC and PharMerica on May 11, 2018, within days after returning to work from protected FMLA leave for a disability, and at the age of 78 years old.

### B.    Hrna's Duties with PharMerica and Joint-Employment With PRMC

13.     Hrna was originally hired by PRMC or its predecessor companies in 2006.  In 2014, PRMC forced Hrna to apply with the staffing company, Luker Pharmacy Management ("Luker").  Hrna applied for and immediately returned to work at PRMC; although allegedly now through Luker.  In or about 2016, Luker was acquired by PharMerica.

14.     All the while at PRMC, Hrna's tasks included, for example, filling or instructing technicians to fill or compound medication orders; compounding or instructing technicians to compound intravenous solutions; filling or supervising the filling of carts used to restock the medications used by the nursing units both night and mornings; and entering surgical orders for all of the morning surgeries.  The medications and surgical orders were maintained by the hospital and ordered by doctors affiliated with the hospital.  Likewise, the intravenous solutions were maintained by the hospital and ordered by doctors affiliated with the hospital.  In addition, Hrna instructed the hospital nursing staff on medications, as needed.  Under the direction of the hospital, Hrna worked the night shift being "on" seven consecutive nights, and "off" the following seven consecutive nights.  While under the supervision, direction and control of the hospital, Hrna was a joint-employee of the hospital as well as PharMerica.

## C.      Hrna Took Job Protected Leave Under the Family Medical Leave Act

15.     Hrna's pertinent medical issues began in mid-January 2018 when his internist was suspicious of an atrial fibrillation and referred him to a specialist.  Hrna informed his supervisor, Anne Raymond, Director of Pharmacy, of the possible diagnosis of an atrial fibrillation.  She suggested that Hrna consider being evaluated in Houston, Texas.  Hrna took her advice and with her knowledge, he began his FMLA-protected leave in early February 2018.  On February 19, 2018, Hrna underwent an eight-hour surgery and was treated for a thoracic aorta aneurism; four coronary artery bypasses; and an atrial fibrillation.

16.     Hrna's surgeries were successful.  He underwent a two-week rehabilitation at HealthSouth Rehabilitation Hospital in Houston, Texas.  At the same time, he received cardiac rehabilitation at PRMC.  During this period, he was placed on a short-term disability leave of absence.  On April 18, 2018, Hrna was evaluated by his doctor and cleared to return to work after April 23, 2018.

17.     Raymond and PRMC were apprised of Hrna's recovery status all the while. Moreover, PRMC knew or should have known about Hrna's medical condition as Hrna was a patient under its care. Surprising to Hrna, in April 2018, Raymond asked Hrna – while he was still on FMLA leave – if he "wanted to retire." Stunned by the question, Hrna replied that he would be visiting with his wife this week and would discuss Raymond's inquiry. Raymond pressed Hrna for a decision. She warned that if he returned to work Raymond and the hospital would "make it very difficult [for Hrna] to do his job." She said that for example they would add many more functions for Hrna to carry out at night. Astounded by the treatment, Hrna replied that he may be forced to retire after the harassment and asked Raymond to stop treating him adversely. Despite the discriminatory warning, Hrna responded that he wanted to continue working for PRMC and PharMerica. Raymond and Hrna agreed that he would return to the office on April 26, 2018.

**D.     After His FMLA Leave, Hrna Returned to PRMC and PharMerica, And Experienced Retaliation**

18.     Upon his return to work, on April 26, 2018, Hrna was given a competency test to re-qualify for certifications to administer intravenous medications. The person who administered the test was a Pharmacy technician licensed by the state to do pharmacy technician tasks doing mostly preparation of intravenous solutions when she worked. As part of the test, Hrna was required to raise his arms to clean the hood, which he was able to do, although with difficulty. His pain was met with a condescending smirk offered by the administering Pharmacy technician. Hrna was taken aback when he saw that the technician was peppering his file with "areas of improvement." In his 50+ year career, he had never been treated with such discriminatory hostility.

19.     The following day, Raymond approached Hrna about various alleged mistakes he had made over the past five years. Some mistakes were minor in nature, others were easily explainable, and most were new to Hrna; however, none of these incidents were mentioned in his

recent 2017 review or any other prior formal review that he had been given.  Moreover, with respect to Hrna's performance during his first week after being out on protected FLMA leave, he asked Raymond for a little time – two weeks – to "get back into the groove."  For instance, Hrna believed that with only two weeks his arm would have regained near full strength, or at least enough strength to pass the certification test Hrna was given on April 26, 2018 with relative ease. Instead of being engaged in the inactive process or being granted a reasonable accommodation, Hrna received the opposite, a short-tempered supervisor who was quick to bristle when his password needed to be reset upon returning from protected leave.  During Hrna's first week back with PRMC and PharMerica, Raymond viciously "papered the file" with pre-textual, fabricated or exaggerated "wrongs" to move towards an outcome-determinative vendetta – resulting in Hrna's wrongful and discriminatory termination. Raymond's self-fulfilling prophecy came to fruition; Hrna's life was hard during his last week at PharMerica and PRMC.

**E.**     **Hrna Was Wrongfully Terminated Two Weeks After Returning From FMLA Leave**

20.     Hrna was out of PRMC from May 3 through May 10, 2018 on his pre-scheduled "off" rotation.  Raymond and Hrna met in person on May 10, 2018.  It was at this meeting that Raymond informed Hrna that his employment would be terminated as of May 11, 2018 and that he was to "retire."  Hrna was dumbfounded and distraught.  At this time, and at all relevant times, Hrna was on prescription medication for his heart related problems that literally kept him alive.

21.     Shortly after his meeting with Raymond, Hrna received a letter from Nick Dillman dated May 11, 2018 with the subject line of "Separation Agreement and Release of Claims."  He was being offered a severance if he released all his claims.  Hrna did not accept the "Separation Agreement."

22.     On May 14, 2017, Denise Luker of Luker Pharmacy Management, sent Hrna an email stating, in relevant part, "[f]irst, I wanted to thank you for your years of service to Peterson

Medical Center.  We appreciate all that you have done to provide safe medications to PRMC patients over the years."

23.     After Hrna's legal counsel at the time informed PharMerica about his claims of discrimination and retaliation, PharMerica's Director, Legal/Commercial Affairs, Jeffrey C. Powell, told Hrna's legal counsel that Hrna had "retired" of his own volition.   This is entirely false.

24.     On or about June 28, 2018, Powell admitted to Hrna's legal counsel that there was no documentation to support Powell's claim that Hrna had "retired" of his own volition, and then Powell suggested that Hrna was terminated for dispensing expired medication, and that he could be subject to professional disciplinary actions before the Texas State Board of Pharmacy.  Of course this was false.  As Denise Luker had just written in her above-referenced email, Hrna had provided "safe medications to PRMC patients [for] the years."

25.     On July 10, 2018, Powell told Hrna's legal counsel that "life isn't fair," and that if Hrna were to continue with his claims, Powell/PharMerica would ensure that Hrna's path ahead "would be very hard."   This is how Defendants treat a 78-year old man who devoted more than a decade of his life to them.   Defendants conduct reeks of reckless indifference and malice towards Hrna.

26.     Hrna was replaced by Chad Michael Batey.  Batey graduated from University of Incarnate Word in San Antonio Texas in 2016.  He is in his twenties or early thirties, meaning he is at least 40 year younger than Hrna.

27.     Hrna was earning a base salary of approximately $112,650 per year at the time of his termination.  Since his termination, he has searched diligently for substantially equivalent employment, and found none.

28.     As set forth herein, Defendants terminated Hrna's employment in violation of the ADEA, TCHRA, and/or FMLA.

## AGE DISCRIMINATION CLAIM UNDER THE ADEA AND TCHRA

**A.     Law**

29.     The ADEA was designed to "promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b).  Under the ADEA, "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

30.     The TCHRA also prohibits age discrimination.  *See* Tex. Lab. Code § 21.051.  The TCHRA's explicit goal was to provide for the execution of federal laws and policies that prohibit discrimination and retaliation.  *See* Tex. Lab. Code § 21.001(1).  As such, courts regularly apply federal anti-discrimination case law from statutes such as the ADEA and Title VII to TCHRA claims.  *See Jurach v. Safety Vision, LLC*, 642 Fed. Appx. 313, 318 (5th Cir. 2016) ("Texas state courts apply analogous federal statutes and cases when interpreting TCHRA").

31.     "A plaintiff can demonstrate age discrimination through direct evidence or by an indirect or inferential [circumstantial] method of proof."  *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004)  To qualify as direct evidence of age discrimination, a statement must be: (1) age related; (2) proximate in time to the termination; (3) made by an individual with authority over the termination; and (4) related to the employment decision.  *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576 (5th Cir. 2003).

32.    The circumstantial model is governed by the well-known burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under the circumstantial model, to establish a *prima facie* case of age discrimination based on circumstantial evidence, a plaintiff must show that (1) he was discharged or otherwise suffered an adverse employment action; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged or discriminated against because of his age. *Rachid*, 376 F.3d at 309 (internal quotations and citations omitted); *Palasota*, 342 F.3d at 575-76.    The burden to establish a *prima facie* case of age discrimination is not an "onerous" one.   *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012).  Under this framework, "a plaintiff is entitled to a 'presumption of discrimination' if he can meet the minimal initial burden of establishing a *prima facie* case." *Id.*

33.    If the plaintiff makes out a *prima facie* case, the burden of production then shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the challenged employment action. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993); *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir. 2006).  If the defendant meets its burden, the presumption raised by the plaintiff's *prima facie* case disappears. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 10 (1981).  The plaintiff is then given the opportunity to demonstrate that the defendant's articulated rationale was merely a pretext for discrimination. *See Hicks*, 509 U.S. at 507-08; *Burdine*, 450 U.S. at 253; *Machinchick v. PB Power, Inc.*, 398 F.3d 345 (5th Cir. 2005).

34.    Regarding the standard of causation, ultimately, under the ADEA, the burden falls to the employee to produce evidence that "but for" his age, he would not have been terminated. *Gross v. FBL Servs. Inc.*, 129 S. Ct. 2343, 2352 (2009) (holding by the U.S. Supreme Court that the ADEA requires "but for" causation).  In contrast, under the TCHRA, the burden falls to the

employee only to produce evidence that his age was a "motivating factor" in his termination. *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 479-80 (Tex. 2001) (motivating factor is the standard of causation under the TCHRA); *see also Squyres v. Heico Cos., L.L.C.*, 782 F.3d 224, 231 (5th Cir.2015) ("The third step of the *McDonnell Douglas* analysis involves a different causation inquiry under the ADEA and the TCHRA."); *Jackson v. Host Intern., Inc.*, Nos. 09–51137, 10–50026, 2011 WL 2119644, at *12 n.2 (5th Cir. Feb. 1, 2011) (noting difference in causation standards between ADEA claims and claims under the TCHRA, and holding that the "motivating factor" standard is the correct standard of causation under the TCHRA, even post-*Gross*).

**B.    Analysis**

35.    Hrna easily makes out a *prima facie* case of age discrimination.  He was 78-years old at the time of his termination.  He was objectively qualified for his job position, and he was discharged.  He was replaced by someone who is at least 40-years younger than him (Mr. Batey), which is obviously sufficiently younger to create a *prima facie* case. *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1506 (5th Cir.1988) (determining that five-year age difference was sufficient to support the district court's assumption that a *prima facie* case has been established); *Glasmire v. Public Storage*, Civil Action No. 4:11–CV–748–Y, 2013 WL 1890363, at *6 (N.D. Tex. May 7, 2013) ("Nevertheless, in the Court's view, the five-plus years' age difference between Glasmire and Bobrowicz is sufficient here to support an inference of discrimination, at least for purposes of Glasmire's *prima-facie* case.").

36.    The burden now shifts to Defendants to articulate a legitimate and nondiscriminatory basis for Hrna's termination.  Defendants claimed Hrna retired.  Defendants later claimed that he was terminated for dispensing expired medication.  Both of these articulated reasons are false.  This proof alone provides sufficient evidence of pretext and age discrimination

*vel non.   See, e.g., Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll.*, 719 F.3d 356, 365 n. 10 (5th Cir. 2013) (reversing summary judgment for the employer in a discrimination case, and holding that, "[e]vidence demonstrating that the employer's explanation is false or unworthy of credence . . . is likely to support an inference of discrimination *even without further evidence of defendant's true motive*.") (italics in original).

37.    In addition, pretext, and thus age discrimination, can be inferred from the fact Defendants gave at least two conflicting reasons for Hrna's termination – retirement and then, later on, allegedly dispensing expired medication.   These are two totally different and conflicting reasons for termination.   As such, a jury may infer that Company simply made up these reasons in an effort to conceal its true motive – age discrimination.   *See, e.g., Nasti v. CIBA Specialty Chem. Corp.*, 492 F.3d 589, 594 (5th Cir. 2007) ("A court may infer pretext where a defendant has provided inconsistent or conflicting explanations for its conduct."); *Burrell v. Dr. Pepper/Seven Up Bottling Grp, Inc.*, 482 F.3d 408, 413-15 (5th Cir. 2007) (shifting explanations can be evidence of pretext); *Gee v. Principi*, 289 F.3d 342, 347-48 (5th Cir. 2002) (same); *Aust v. Conroe Indep. Sch. Dist.*, 153 S.W.3d 222 (Tex. App. – Beaumont 2004, no pet.) (shifting explanations given by the employer for its decision to terminate the plaintiff established a fact issue over whether its decision was motivated by unlawful discrimination); *cf. Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 235-36 (5th Cir. 2015) (reversing summary judgment for employer in discrimination case where two company witnesses gave different and shifting reasons for the decision to terminate the plaintiff).

38.    Moreover, Raymond's and Defendants' attempt to quickly build a file based on stale, trivial, and meritless allegations against Hrna immediately before his termination further demonstrates pretext.   *See also Burton*, 798 F.3d at 237 ("Evidence of a sudden and unprecedented

campaign to document Burton's deficiencies and thus justify a decision that had already been made, however, could raise an inference of pretext.").

39.     Finally, that Defendants explicitly unilaterally sought to force Hrna into retirement is highly probative and potent proof of age discrimination *vel non*.   *See Weaver v. Amoco Production Co.,* 66 F.3d 85, 87 (5th Cir. 1995) (affirming age discrimination verdict for plaintiff where the employer's manager told him that "you'll have to retire.").   Frankly, even without all the other proof of age discrimination – of which there is a mountain – this proof alone is dispositive, just as it was in *Weaver*.

## DISABILITY DISCRIMINATION UNDER THE TCHRA

A.     **Law**

40.     "The [Americans with Disabilities Act] ADA prohibits an employer from discriminating against a 'qualified individual with a disability on the basis of that disability.'" *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (quoting 42 U.S.C. § 12112(a)). The TCHRA was "enacted to address the specific evil of discrimination and retaliation in the workplace." *City of Waco v. Lopez*, 259 S.W.3d 147, 153 (Tex. 2008); see also Tex. Lab. Code Ann. §§ 21.001–.566.   The TCHRA's "general purposes" include executing "the policies embodied in Title I of the Americans with Disabilities Act of 1990 and its subsequent amendments (42 U.S.C. Section 12101 *et seq*.)" and securing "for persons in this state, including persons with disabilities, freedom from discrimination in certain employment transactions, in order to protect their personal dignity." Tex. Lab. Code Ann. §§ 21.001(3) & (4).   Therefore, both the federal court decisions interpreting the ADA and the federal administrative regulations regarding the ADA guide Texas state court's interpretation of "disability" contained in the TCHRA. *See Little v. Tex. Dep't of Criminal Justice*, 148 S.W.3d 374, 381–82 (Tex. 2004); *see also Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 473–74 (5th Cir. 2006) (applying federal court ADA precedent

to a TCHRA disability discrimination claim); *Molina v. DSI Renal, Inc.*, 840 F. Supp. 2d 984, 993-1004 (W.D. Tex. 2012) (same).

41.     Under the TCHRA, "[a]n employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer ... fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment...." Tex. Lab. Code Ann. § 21.051(1).   The same is true under the ADA.   *See* 42 U.S.C. § 12112.   Under the TCHRA, "[A]n unlawful employment practice is established when the complainant demonstrates that . . . disability was a motivating factor for an employment practice, even if other factors also motivated the practice...." *Id.* § 21.125(a).   The Texas Supreme Court has explained "that 'a motivating factor' is the correct standard for the plaintiff in all TCHRA unlawful employment practice claims...." *Quantum Chem. Corp.*, 47 S.W.3d at 480.   This language states exactly "what a complainant must show in order to prevail in a lawsuit." *Id.*   The same is true under the ADA.   *See LHC Grp., Inc.*, 773 F.3d at 702 (applying "motivating factor" standard in an ADA case).

42.     "Texas courts follow the settled approach of the U.S. Supreme Court in recognizing two alternative methods of proof in discriminatory treatment cases." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012).   The first method "involves proving discriminatory intent via direct evidence of what the defendant did and said." *Id.* "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002).   "[M]otives are often more covert than overt, making direct evidence of forbidden animus hard to come by." *Garcia*, 372 S.W.3d at 634.   "There will seldom be 'eyewitness' testimony as to the employer's mental processes." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716

(1983).  This limitation is not unique to discrimination cases – "[t]he law often obliges finders of fact to inquire into a person's state of mind." *Id.*  Discrimination is not treated "differently than other ultimate questions of fact." *Id.*

43.     Accordingly, the second method allows a plaintiff to prove discriminatory intent using circumstantial evidence. *See El Paso Cmty. College v. Lawler*, 349 S.W.3d 81, 86 (Tex. App.—El Paso 2010, pet. denied); *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009).  This often involves "the burden-shifting mechanism of *McDonnell Douglas*." *Garcia*, 372 S.W.3d at 634 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)).  "The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the plaintiff has his day in court despite the unavailability of direct evidence." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (quotations omitted).  "Under this framework, the plaintiff is entitled to a presumption of discrimination if he meets the 'minimal' initial burden of establishing a *prima facie* case of discrimination." *Garcia*, 372 S.W.3d at 634.  "Although the precise elements of this showing will vary depending on the circumstances, the plaintiff's burden at this stage of the case is not onerous." *Id.* (quotations omitted).

44.     Under this framework, the plaintiff must make a *prima facie* showing of discrimination. *Id.*  To establish a *prima facie* case of disability discrimination, a plaintiff must prove: (1) that he has a disability; (2) that he was qualified for the job; [and] (3) that he was subject to an adverse employment decision on account of his disability.  *LHC Grp., Inc.*, 773 F.3d at 697.  Once the *prima facie* showing is made, a presumption of discrimination arises, and the employer must "articulate a legitimate non-discriminatory reason for the adverse employment action." *Chevron Phillips Chem. Co., LP*, 570 F.3d at 615.  The burden then shifts to the plaintiff to show the articulated reason is pretextual. *Id.*  As set forth below, Hrna easily makes out a disability discrimination, under both the direct and circumstantial models of proof.

**B.    Analysis**

    **1.    Hrna Had An Actual And A Perceived Disability**

        **a)    Actual Disability**

45.    Under Texas Labor Code Section 21.002(6), the term actual "disability" is defined, in relevant part, as, "a physical or mental impairment that substantially limits one or more major life activities of [an] individual."  The same is true under the ADA.  *See* 42 U.S.C. §12102(1). Under TCHRA Section 21.002(11-a) "major life activities" include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.  The term also includes the operation of a major bodily function, including, but not limited to, functions of the immune system, normal cell growth, and digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."  The same is true under the ADA.  *See* 42 U.S.C. §12102(2).

46.    In 2009, statutory revisions to the ADA broadened the definition of disability. ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553 (ADAAA) ("The definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act.").  "The ADAAA is principally aimed at reversing Supreme Court precedent perceived as improperly narrowing the scope of protection originally intended by drafters of the ADA." Louis P. DiLorenzo, The Intersection of the FMLA and ADA–As Modified by NDAA, ADAAA and GINA, 860 PLI/Lit 47, 83–84 (June 23, 2011); 29 C.F.R. § 1630.1(c)(4) ("reinstating a broad scope of protection under the ADA"; "the definition of 'disability shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA").  The EEOC emphasized that "the primary object of attention in cases . . . should be whether the covered entities have complied with their obligations and

whether discrimination has occurred, not whether the individual meets the definition of disability." 29 C.F.R. § 1630.1(c)(4).

47.     The ADAAA further states that the intent of these changes is that employers stop engaging in "extensive analysis" to determine what constitutes a disability under the law, and focus instead on complying with their obligation not to discriminate and to provide reasonable accommodations to individuals who are otherwise qualified to do a job.  It also provides the following "[r]ules of construction" regarding the definition of disability:

> The definition of "disability" in paragraph (1) shall be construed in accordance with the following:
>
> (A)     The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.
>
> (B)     The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.
>
> (C)     An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.
>
> (D)     An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.
>
> (E)(i)  The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as—
>
> (I)     medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies . . . .

48.     The ADAAA became effective January 1, 2009.  The amendments to the ADA made by the ADAAA were also made to the Texas Labor Code, effective September 1, 2009, and thus are part of the TCHRA.  *See* H.R. 978, 81st Leg., Reg. Sess. (Tex. 2009); *see also City of Houston v. Proler*, 437 S.W.3d 529, 533 n.17 (Tex. 2014) ("In 2009, the Texas Legislature added new provisions to the Labor Code that corresponded to the federal amendments").

49.     Under the ADAAA, there is no question that Hrna's thoracic aorta aneurism; coronary artery disease; atrial fibrillation problems, and heart related problems qualify as actual disabilities because they substantially limited Hrna's circulatory system (which is a major life activity).  *See, e.g., Blackwell v. SecTek, Inc.*, 61 F. Supp. 3d 149, 156 (D.D.C. 2014) (plaintiff with organic heart disease sufficiently alleged a disability under the ADA).

### b)      Perceived Disability

50.     Before September 1, 2009, the TCHRA did not contain a definition of "being regarded as having such an impairment." *See* Act of May 27, 2009, §§ 1, 6, 2009 Tex. Gen. Laws at 869–70 (adding to Labor Code section 21.002(12–a), which contains a statutory definition of "regarded as having such an impairment").  Under this earlier version of the statute, the third category in the "disability" definition was "being regarded as having a mental or physical impairment that substantially limits at least one major life activity of the individual." *See* Act of May 26, 1997, § 1, 1997 Tex. Gen. Laws 2676, 2676; City of Houston v. Proler, 437 S.W.3d 529, 533 & n.16 (Tex. 2014).

51.     In 2009, the Texas Legislature added subsection (12–a) to Labor Code section 21.002 and amended the TCHRA in other ways in an attempt to mirror the corresponding changes that Congress made to the Americans with Disabilities Act by the ADA Amendments Act of 2008. *See* Pub. Law. No. 110–325, 122 Stat. 3353 (2008); Act of May 27, 2009, 81st Leg., R.S., ch. 337, §§ 1–6, 2009 Tex. Gen. Laws 868, 868–70.  Under this statutory definition of "regarded as having such an impairment," the third category in the "disability" definition is "subjected to an action prohibited under Subchapter B or C because of an actual or perceived physical or mental impairment, other than an impairment that is minor and is expected to last or actually lasts less than six months, regardless of whether the impairment limits or is perceived to limit a major life activity." Labor Code Ann. § 21.002(12–a). To fall within the third category under the current

version of the statute, the perceived mental or physical impairment need not substantially limit at least one major life activity, but it must not be minor and expected to last less than six months. *See id.* The current version of the TCHRA applies to Hrna.

52.     To establish "disability" under this section, Hrna need only show that his "employer perceived him as having an impairment" and that it discriminated against him on that basis. *See Burton*, 798 F.3d at 230.   A qualifying "impairment" includes "[a]ny physiological disorder or condition" that affects, among other body systems,  "neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)).

53.     In this case, there is overwhelming proof that Defendants perceived Hrna "as having an impairment" and that they discriminated against him on that basis.  As to the "perceiving Hrna as having an impairment" prong, as explained above, Defendants were well aware of Hrna's medical condition between February 2018 and his termination in May 2018.  This awareness alone amply satisfies the requirement to demonstrate that Defendants "perceived Hrna as having an impairment" under the TCHRA.  *See Burton*, 798 F.3d at 230-31 (doctors notes received by employer and other medical related concerns of employer established that employer perceived the employee as having an impairment under the ADA).

54.     As to the "and that it discriminated against him on that basis" prong, that too is easily established because Defendants relentlessly harassed, threatened, failed to accommodate, and then terminated Hrna between the date of his anticipated and then actual return to work from his leave of absence in late April 2018, and being told of his termination just two weeks later, on May 10, 2018.  This evidence easily satisfies Hrna's burden to show that Defendants discriminated against him based on a perceived impairment.  *See Cannon v. Jacobs Servs. N.A., Inc.*, 813 F.3d

586, 591-92 (5th Cir. 2016) (finding fact question existed on whether or not employer perceived plaintiff to have an impairment and discriminated against him on that basis under the ADA); *Burton*, 798 F.3d at 231 (same, and relying upon close timing between employer's knowledge of employee's medical problem and its decision to terminate the employee).

### 2.      Hrna Was A Qualified Individual With A Disability

55.      Under the TCHRA and ADA, the plaintiff can satisfy the "qualification" element in one of two ways: (1) by proving that he can perform all essential job functions with or without modifications or accommodations; or (2) by showing that some reasonable accommodation by the employer would enable him to perform the job." *Austin State Hosp. v. Kitchen*, 903 S.W.2d 83, 91 (Tex. App.–Austin 1995, no writ); 42 U.S.C. § 12111(8).    The term "reasonable accommodation" may include—

> (A)      making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B)      job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

56.      The ADA and the TCHRA require employers to try to work interactively with disabled employees in, "a meaningful dialogue with the employee to find the best means of accommodating that disability." *Chevron Phillips Chem. Co.*, 570 F.3d at 621 (citation omitted). The process thus requires "communication and good-faith exploration." *Id.* (citation omitted).

57.      The Fifth Circuit has recognized that "where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Chevron Phillips Chem.*

*Co.*, 570 F.3d at 621 (citation omitted).  Once an employee makes such a request, however, the employer is obligated by law to engage in an "interactive process": "a meaningful dialogue with the employee to find the best means of accommodating that disability." *Id.* (citation omitted).  The process thus requires "communication and good-faith exploration." *Id.* (citation omitted).

58.     The Fifth Circuit has held: "when an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA." *Jenkins v. Cleco Power LLC*, 487 F.3d 309, 316 (5th Cir. 2007).  The law under the TCHRA is the same: "[o]nce the employee identifies a disability and resulting limitations, and suggests a reasonable accommodation, the employer and the employee should engage in flexible, interactive discussions to determine the appropriate accommodation." *Hagood v. County of El Paso*, 408 S.W.3d 515, 525 (Tex. App.-El Paso 2013, no pet.). "The interactive process requires communication and good-faith exploration." *Id.* (internal citations omitted). "When an employer does not engage in a good faith interactive process, the employer violates the [TCHRA]." *Id.*

59.     Here, Hrna was qualified in all objective respects for his job as a pharmacist.  He held all required licenses.  He was able to, and did perform, all essential functions of the job.  As such, Hrna easily fulfills this element.

### 3.     Defendants Terminated Hrna Because Of His Disability

60.     There is no question that Hrna suffered an adverse employment decision when he was terminated. *See LHC Grp., Inc.*, 773 F.3d at 700 (termination is an adverse action under the law).  There is also substantial evidence that Defendants' articulated reasons for terminating Hrna are pretexts for disability discrimination.  Specifically, as noted above, Defendants gave false and conflicting reasons for terminating Hrna. *See, e.g., Haire*, 719 F.3d at 365 n. 10 (reversing summary judgment for the employer in a discrimination case, and holding that, "[e]vidence

demonstrating that the employer's explanation is false or unworthy of credence . . . is likely to support an inference of discrimination *even without further evidence of defendant's true motive*.") (italics in original); *Burrell*, 482 F.3d 413-15 (shifting explanations can be evidence of pretext); *Burton.*, 798 F.3d at 235-36 (reversing summary judgment for employer in a disability discrimination case where two company witnesses gave different and shifting reasons for the decision to terminate the plaintiff). In addition, as also set out above, Defendants relentlessly harassed, threatened, and failed to accommodate Hrna between the date of his anticipated and then actual return to work from his leave of absence in late April 2018, and termination just two weeks later, in May 2018. This evidence of harassment, threats, and failures to accommodate further bolsters Hrna's already strong claim that he was terminated because of his actual or perceived disability, in violation of the TCHRA. *See Burton*, 798 F.3d at 237 ("Evidence of a sudden and unprecedented campaign to document Burton's deficiencies and thus justify a decision that had already been made, however, could raise an inference of pretext."); *LHC Grp., Inc.*, 773 F.3d at 703 (employer's statements that arguably showed a hostility towards the plaintiff's medical disability, combined with other evidence, was sufficient to create a fact question, and require reversal of the district court's decision to grant summary judgment for the employer in a disability discrimination case).

## FMLA RETALIATION CLAIM

A.    **Law**

61.    The FMLA and its regulations set forth rules for employers to follow that are detailed, comprehensive, and completely contrary to the "at-will" employment rule. See *Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973, 977 (5th Cir. 1998) ("It goes without saying that the FMLA makes incredible inroads on an at-will employment relationship, such as Satterfield's with Wal-Mart."). The FMLA was enacted to permit employees to take up to twelve

weeks per year of job-protected leave for medical reasons, for the birth or adoption of a child, and

for the care of a child, spouse, or parent who has a serious health condition. 29 U.S.C. § 2601(b)(2).

62.     "The FMLA has two distinct sets of provisions, which together seek to meet the

needs of families and employees and to accommodate the legitimate interests of employers." *Hunt*

*v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 763 (5th Cir. 2001) (citing *Nero v. Industrial*

*Molding Corp.*, 167 F.3d 921, 927 (5th Cir. 1999) *Bocalbos v. National W. Life Ins. Co.*, 162 F.3d

379, 383 (5th Cir. 1998)).   The first set of provisions are prescriptive:  They create a series of

substantive rights, namely, the right to take up to twelve weeks of unpaid leave under certain

circumstances. *Id.* For example, the FMLA makes it "unlawful for any employer to interfere with,

restrain, or deny the exercise of or the attempt to exercise" any FMLA right. 29 U.S.C. §

2615(a)(1). "If an employer takes an employment action based, in whole or in part, on the fact that

the employee took FMLA-protected leave, the employer has denied the employee a benefit to

which he is entitled." *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007).   The

provisions in the second set are proscriptive:  They bar employers from penalizing employees and

other individuals for exercising their rights.  *Id.*; *see also* 29 U.S.C. §§ 2615(a)(1)-(2); *Faris v.*

*Williams WPC-I, Inc.*, 332 F.3d 316, 320-22 (5th Cir. 2003) (holding that there is a distinction

between substantive FMLA rights and causes of action for retaliation designed to protect those

rights); *Chaffin v. John H. Carter Co.*, 179 F.3d 316, 319 (5th Cir. 1999); *Bocalbos*, 162 F.3d at

383 ("[T]he Act protects employees from interference with their leave as well as against

discrimination or retaliation for exercising their rights.").

**B.     Analysis**

63.     Section 2615(a)(2) of the FMLA makes it "unlawful for any employer to discharge

or in any other manner discriminate against any individual for opposing any practice made

unlawful by this subchapter." § 2615(a)(2).  To make out a *prima facie* case for retaliation under

§ 2615(a)(2), a plaintiff must show that: (1) he was protected under the FMLA; (2) he suffered an adverse employment decision; and either (3a) that he was treated less favorably than an employee who had not requested leave under the FMLA; or (3b) the adverse decision was made because he took FMLA leave. *Hunt*, 277 F.3d at 768 (citation omitted). If this initial burden is met, the employer-defendant must then articulate a legitimate reason for the employment action. *Hunt*, 277 F.3d at 768. If that is done, the employee must then show that the articulated reason was actually a pretext for retaliation. *Id.* The plaintiff need not prove that the exercise of FMLA rights was the sole cause of the unfavorable treatment; "[t]he plaintiff is, however, required to show that the protected activity and the adverse employment action are not completely unrelated." *Mauder v. Metropolitan Transit Authority of Harris Cty., Texas*, 446 F.3d 574, 583 (5th Cir. 2006).

64.     Hrna can establish a *prima facie* case. It is undisputed that he was protected by the FMLA (element one), that he was terminated (element two), and that he was treated less favorably than employees who had not requested leave under the FMLA (element three). *See Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009) (less favorable treatment under nearly identical circumstances establishes a *prima facie* case). Moreover, disparate treatment aside, Hrna also independently satisfies the third element of his *prima facie* case based on the close timing – approximately two and one-half weeks – between the date he returned to work from FMLA leave (April 26, 2018), and the date Defendants told him he was fired (May 10, 2018). *See Cantu v. Vitol, Inc.*, Civil Action No. H-09-0576, 2011 WL 486289, at *10 (S.D. Tex. Feb. 7, 2011) (Rosenthal, J.) (noting that "the Fifth Circuit has found temporal proximity of up to four months sufficient to show a causal link."). *See also Allain v. Bd. of Supervisors of Univ. of Louisiana Sys.*, 81 F. Supp.3d 502, 512 (W.D. La. 2015) ("It is undisputed that Allain returned from FMLA-protected leave on March 1, 2011, and was informed that she was being terminated approximately six weeks later on April 14, 2011. Allain has, therefore, established her *prima facie* case.").

Hrna can also demonstrate pretext.  Specifically, as noted above, Defendants gave false and conflicting reasons for terminating Hrna.  *See, e.g., Haire*, 719 F.3d at 365 n. 10 (reversing summary judgment for the employer in a discrimination case, and holding that, "[e]vidence demonstrating that the employer's explanation is false or unworthy of credence . . . is likely to support an inference of discrimination *even without further evidence of defendant's true motive*.") (italics in original); *Burrell*, 482 F.3d 413-15 (shifting explanations can be evidence of pretext); *Burton.*, 798 F.3d at 235-36 (reversing summary judgment for employer in a disability discrimination case where two company witnesses gave different and shifting reasons for the decision to terminate the plaintiff).    In addition, as also set out above, Defendants relentlessly harassed, threatened, and failed to accommodate Hrna between the date of his anticipated and then actual return to work from his leave of absence in late April 2018, and termination just two weeks later, in May 2018.    This evidence of harassment, threats, and failures to accommodate further bolsters Hrna's already strong claim that he was terminated in retaliation for his FMLA leave.  *See also Burton*, 798 F.3d at 237 ("Evidence of a sudden and unprecedented campaign to document Burton's deficiencies and thus justify a decision that had already been made, however, could raise an inference of pretext."); *LHC Grp., Inc.*, 773 F.3d at 703 (employer's statements that arguably showed a hostility towards the plaintiff's medical disability, combined with other evidence, was sufficient to create a fact question, and require reversal of the district court's decision to grant summary judgment for the employer in a disability discrimination case).

## **DAMAGES**

65.    The damages under the ADEA, TCHRA, and FMLA consist of back-pay, front-pay (or reinstatement), liquidated damages, compensatory damages, punitive damages, attorneys' fees, and costs.  Each component is explained below.

66.   <u>Back-pay</u>.   Prevailing claimants under the ADEA, TCHRA, and FMLA may recover lost back-pay and benefits. *See Miller*, 716 F.3d at 146.   The purpose of back pay is to "make whole the injured party by placing that individual in the position he or she would have been in but for the discrimination." *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988). At the time of his termination, Hrna had a base salary of approximately $112,650 per year.   Hrna has exercised diligence in attempting to find a substantially equivalent job, but has not found one. Instead, he remains unemployed.   Obtaining a substantially equivalent replacement job at age 78 will be extremely difficult, if not impossible.[1]   Any out-of-pocket expenses for health insurance or other benefits Hrna had through Defendants, or for replacement insurance, would be recoverable. *See Lubke v. City of Arlington*, 455 F.3d 489, 499 (5th Cir. 2006); *Pearce v. Carrier Corp.*, 966 F.2d 958, 959 (5th Cir. 1992).

67.   <u>Front-pay or Reinstatement</u>.   Prevailing claimants under the ADEA, TCHRA, and FMLA are entitled to front pay or reinstatement.   "Front pay refers to future lost earnings." *Wal-Mart Stores v. Davis*, 979 S.W.2d 30, 45 (Tex. App.–Austin 1998, pet. denied).   The law allows a plaintiff to recover front pay when a plaintiff shows that reinstatement is not feasible.   TEX. PATTERN JURY INSTRUCTIONS § 110.30, Comment, Front Pay (2003 ed.) (citing federal law); *cf. Brunnemann v. Terra Int'l Inc.*, 975 F.2d 175, 180 (5th Cir. 1992) (ADEA case).   Generally, reinstatement is the preferred equitable remedy for a discriminatory discharge. *Julian v. City of Houston, Tex.*, 314 F.3d 721, 729 (5th Cir. 2002).   However, if reinstatement is not feasible, front-pay will be awarded if it is consistent with the remedial purposes of the law. *Brunnemann*, 975 F.2d at 180.   "[R]einstatement is not preferred over front pay when there is no vacancy in the desired position." *Mitchell v. Sisters of Charity of Incarnate Word*, 924 F. Supp. 793 (S.D. Tex.

---

[1] *See, e.g.*, http://knowledge.wharton.upenn.edu/article.cfm?articleid=2577 (Interview in September 2010 with Peter Cappelli, director of Wharton's Center for Human Resources, in which he states: "If you look at the research on older workers, you see an incredible amount of discrimination against them, bigger than race, bigger than gender.   Older workers struggle to get hired.").

1996) (quoting *Shore v. Federal Express Corp.*, 777 F.2d 1155 (6th Cir. 1985)). In other words, if reinstatement would require displacing or bumping an innocent employee from their job, then it is considered to be infeasible, and front-pay may be awarded instead of reinstatement. *See Ray v. Iuka Special Mun. Separate Sch. Dist.*, 51 F.3d 1246, 1254 (5th Cir. 1995).

68.     In this case, a significant front-pay award would be justified. *See, e.g., Jackson*, 2011 WL 2119644, at *8-9 (Fifth Circuit decision affirming five-year front-pay award in an age discrimination case); *Mota v. University of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 527 (5th Cir. 2001) (affirming front-pay award of approximately ten years); *Donlin v. Philips Lighting North Am. Corp.*, 581 F.3d 73, 88 (3rd Cir. 2009) (holding that district court did not abuse its discretion in awarding plaintiff front-pay for ten years); *Meacham v. Knolls Atomic Power Lab.*, 381 F.3d 56, 79 (2d Cir. 2004) (affirming front-pay awards of nine to twelve and one-half years), *vacated on other grounds sub nom KAPL, Inc. v. Meacham*, 544 U.S. 957 (2005); *Gotthardt v. National R.R. Passenger Corp.*, 191 F.3d 1148 (9th Cir. 1999) (affirming an eleven-year front pay award); *Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 F.3d 562, 574 (7th Cir. 1995) (holding that ten-year front-pay award did not constitute an abuse of discretion); *Hukkanen v. International Union of Operating Eng'rs, Hoisting & Portable Local No. 101*, 3 F.3d 281, 286 (8th Cir. 1993) (holding that a ten year front-pay award did not constitute an abuse of discretion).

69.     <u>Liquidated Damages - ADEA.</u>   Claimants under the ADEA are also entitled to liquidated damages – a doubling of the back-pay award – where a violation is determined to be willful. *See Miller*, 716 F.3d at 145. "A violation of the ADEA is willful if the employer knew or showed reckless disregard for whether its conduct was prohibited by the ADEA." *Smith v. Berry Co.*, 165 F.3d 390, 395 (5th Cir. 1999) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 (1985). Defendants' violation in this case was willful. *See Miller*, 716 F.3d at 145

(evidence supported jury's finding of a willful violation of the ADEA by Raytheon even though it was "undisputed that Raytheon had to undertake a reduction in force and that it instituted facially age-neutral policies and processes according to which a nondiscriminatory basis for Miller's termination could be justified."); *Palasota,* 499 F.3d at 481-82 (evidence supported finding of a willful violation of the ADEA, thus justifying award of liquidated damages); *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 391-92 (5th Cir. 2003) (same); *Tyler v. Union Oil Co.*, 304 F.3d 379, 398-99, 401 (5th Cir. 2002) (same, and stating that "[w]e hold that the plain language of the statutes requires the interpretation that liquidated damages in an amount equal to the back pay award are mandatory upon a finding of willfulness."); *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 256-57 (5th Cir. 1996) (same); *Weaver,* 66 F.3d at 88 (upholding finding of willfulness where plaintiff was forced to retire).   Assuming it takes two years to get to trial, and Hrna remains unemployed, then his back pay losses would be approximately $225,300, and that number would be doubled for liquidated damages, bringing the total for back pay and liquidated damages to $450,600.  That does not include the other elements of damages that are available, as set forth herein.

70.   <u>Liquidated Damages – FMLA</u>.  An award of liquidated damages (double the back-pay award) is the norm.  *See Nero v. Industrial Molding Corp.*, 167 F.3d 921, 929 (5th Cir. 1999) (awarding liquidated damages to prevailing FMLA plaintiff and noting that they are normally to be awarded to prevailing FMLA plaintiffs).  "[A] district court may not exercise its discretionary authority to reduce or to eliminate a liquidated damages award unless the employer first sustains its burden of showing that its failure to obey the statute was in good faith." *Nero*, 167 F.3d at 928. Specifically, to avoid an award of liquidated damages, the employer must demonstrate good faith and reasonable grounds with respect to "the act or omission which violated" the FMLA. 29 U.S.C.

§ 2617(a)(1)(A)(iii).  Defendants cannot demonstrate "good faith" under this demanding standard, and thus is liable for liquidated damages.

71.  <u>Compensatory Damages</u>.  A prevailing plaintiff is entitled to compensatory damages under the TCHRA for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses."  TEX. LAB. CODE § 21.2585 (d). *See, e.g.*, *Jackson*, 2011 WL 2119644, at *8-9  (affirming $300,000.00 compensatory damages award in a single-plaintiff TCHRA age-discrimination case); *Giles v. General Electric Co*., 245 F.3d 474, 489 (5th Cir. 2001) (awarding $150,000.00 compensatory damages award in a single-plaintiff employment discrimination case).

72.  <u>Punitive Damages</u>.  Prevailing claimants under the TCHRA are also entitled to punitive damages where a violation is shown to have been made with reckless disregard or malice – as it clearly was here. TEX. LAB. CODE 21.2585; *see e.g., Quality Dialysis, Inc. v. Adams*, NO. 13-05-086-CV, 2006 WL 1553353, at *11 (Tex. App.–Corpus Christi June 8, 2006, no pet.) (affirming jury's award of punitive damages against employer in an age discrimination case). Further, the previously recited post-termination comments by Defendants' counsel further demonstrate a reckless disregard or malice for Hrna's rights under the TCHRA, and for Hrna as a human being.

73.  <u>Attorneys' fees</u>.  Attorneys' fees are recoverable to a prevailing plaintiff under the ADEA, TCHRA, and FMLA. *See Miller*, 716 F.3d at 149 (affirming an award of attorneys' fees of $488,437.08 to the plaintiff in a single-plaintiff ADEA/TCHRA discrimination case that arose in Dallas); *Lewallen v. City of Beaumont,* 394 Fed. Appx. 38, 46 (5th Cir. 2010) (affirming an award of attorneys' fees of $428,421.75 to the plaintiff in a single-plaintiff discrimination failure to promote case); *Watkins v. Input/Output, Inc.*, 531 F. Supp. 2d 777, 789 (S.D. Tex. 2007)

(awarding prevailing plaintiff in a single-plaintiff ADEA case tried in Houston $336,010.50 in attorneys' fees).

## EXHAUSTION

74.     On August 9, 2018, Hrna timely filed a Charge of Discrimination alleging age discrimination with the EEOC and the Texas Workforce Commission – Civil Rights Division ("TWC-CRD"). As of the filing of this lawsuit, more than sixty days have passed since Hrna filed that Charge of Discrimination.   Accordingly, Hrna has exhausted his administrative remedies under the ADEA as to his discrimination claim.   This is so because, in order to comply with the exhaustion requirement under the ADEA, "[f]or cases arising in Texas, a complainant [simply] must file [an EEOC charge] within 300 days of the last act of discrimination" and "then wait sixty days before filing a civil action." *See Julian v. City of Houston*, 314 F.3d 721, 726 (5th Cir. 2002). Under 29 U.S.C. § 626(d), "the claimant's independent right to sue arises automatically upon the expiration of sixty days after filing of the charge with the EEOC." *Id.* (footnote omitted).   As the Fifth Circuit explained in *Julian*:

> But there are preconditions to bringing suit under the ADEA.   Title 29 U.S.C. §
> 626(d) provides: "No civil action may be commenced by an individual under this
> section until 60 days after a charge alleging unlawful discrimination has been filed
> with the Equal Employment Opportunity Commission."   Thus, a person seeking
> relief under the ADEA must first file an administrative charge with the EEOC.   And
> § 626(d) establishes time limits for filing the EEOC charge.   For cases arising in
> Texas, a complainant must file within 300 days of the last act of discrimination.
> After timely filing the EEOC charge, the complainant must then wait sixty days
> before filing a civil action.   Under the plain language of § 626(d), "the claimant's
> independent right to sue arises automatically upon the expiration of sixty days after
> filing of the charge with the EEOC."   Accordingly, a complainant who timely files
> the EEOC charge and then observes the sixty-day waiting period has satisfied the
> statutory preconditions to filing suit.

*Id.* at 725-26 (footnotes omitted).

75.     Hrna has also exhausted his administrative remedies as to his TCHRA claims for age and disability discrimination.   In order to comply with the exhaustion requirement under the

TCHRA, a claimant must: (1) file a complaint with the TWC-CRD within 180 days of the alleged discriminatory act; (2) allow the TWC-CRD to dismiss the complaint or resolve the complaint within 180 days before filing suit; and (3) file suit no later than two years after the complaint is filed. *Rice v. Russell-Stanley, L.P.*, 131 S.W.3d 510, 513 (Tex. App.–Waco 2004, pet. denied); TEX. LAB. CODE §§ 21.201-.202, 21.208 (Vernon 2006). Thus, a plaintiff need not actually obtain a right-to-sue letter in order to exhaust his or her administrative remedies; he or she need only be entitled to one. "Texas courts hold that it is the entitlement to a right-to-sue letter rather than the receipt of the letter that exhausts the complainant's administrative remedies." *Wooten v. Federal Exp. Corp.*, No. 3:04–CV–1196–D, 2007 WL 63609, at *8 n. 14 (N.D. Tex. Jan. 9, 2007) (citing *Rice v*, 131 S.W.3d at 513), *aff'd*, 325 Fed. Appx. 297 (5th Cir. 2009). In other words, "the right-to-sue letter is not part of the exhaustion requirement, only notice of exhaustion [is required]." *Rice*, 131 S.W.3d at 513.

76.     Based on the foregoing, satisfied all three requirements. First, Hrna filed an EEOC and TWC-CRD Charge on August 9, 2018, which is well within 180 days of the discrimination he complains of in this case.  Second, Hrna allowed the TWC-CRD 180 days to dismiss or resolve the complaint, and it has done neither.  Third, as of February 5, 2019, 180 days has passed since he filed his Charge of Discrimination with the EEOC/TWC-CRD.

## JURY DEMAND

77.     Hrna demands a jury trial.

## PRAYER

Hrna asks that the court issue summons for Defendants to appear and answer, and that he be awarded a judgment against Defendants for the following:

a.      Actual damages including but not limited to pecuniary losses, non-pecuniary losses, back-pay, and front-pay (or reinstatement);

b.      Liquidated damages;

c.      Compensatory damages'

d.      Punitive damages'

e.      Prejudgment and post-judgment interest;

f.      Attorneys' fees and court costs;

g.      Injunctive relief;

h.      All other relief to which Plaintiff is entitled.

Respectfully submitted,

OBERTI SULLIVAN LLP

By:     s/ Mark J. Oberti
        Mark J. Oberti
        State Bar No. 00789951
        712 Main Street, Suite 900
        Houston, TX 77002
        (713) 401-3555 – Telephone
        (713) 401-3547 – Facsimile
        mark@osattorneys.com – Email

        ATTORNEY-IN-CHARGE FOR PLAINTIFF

OF COUNSEL:

Edwin Sullivan
State Bar No. 24003024
OBERTI SULLIVAN LLP
712 Main Street, Suite 900
Houston, TX 77002
(713) 401-3555 – Telephone
(713) 401-3547 – Facsimile
ed@osattorneys.com – Email

ATTORNEYS FOR PLAINTIFF

### AFFIDAVIT OF DANIEL HRNA

STATE OF T E X A S      §

                              §

COUNTY OF HARRIS      §

On this day, Daniel Hrna appeared before me, the undersigned authority, who upon his oath, deposes and states:

1. I am over the age of 21, competent to make this affidavit, and have personal knowledge that everything stated herein is true and correct. I have read Plaintiff's Sworn Original Complaint in this case. Unless otherwise indicated as being on "information and belief," the statements in paragarphs 10 through 22, and 27 of Plaintiff's Sworn Original Complaint in this case are all true and correct on my personal knowledge.

_____

DANIEL HRNA

SUBSCRIBED AND SWORN TO before me on this the 25th day of January 2019, certify which witness my hand and seal of office.

_____

Notary Public in and for
The State of TEXAS
Printed name: _LISA M GREER_

LISA M GREER
NOTARY PUBLIC-STATE OF TEXAS
COMM. EXP. 11-09-2019
NOTARY ID 12631803-7